# United States Court of Appeals
## For the First Circuit

No. 07-2776

UNITED STATES OF AMERICA,

Appellee,

v.

QUENTA PARKER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Torruella, Boudin and Howard,

Circuit Judges.

William Gray Schaffer, by appointment of the court, for appellant.
Aixa Maldonado-Quiñones, Assistant United States Attorney, with whom Thomas P. Colantuono, United States Attorney, was on brief for appellee.

November 26, 2008

BOUDIN, **Circuit Judge**. On February 16, 2005, around eight p.m. Sergeant Duval of the Somersworth, New Hampshire, Police Department responded to a 911 call from the home of Carrie Davis. Davis told Duval that she had been threatened by three men--two black, one white--who had arrived at the apartment looking for her boyfriend, Richard Post. When told that Post was not there, one of the black males, known to Davis as "H," said that she knew what they wanted and exposed a black firearm in his waistband. The white male, whom she knew as "Jose," was holding a tool with a blade which he smacked on his hand. Davis knew the other black male only as "Q."

The three men, Post's sister told Duval, were looking for Post because he had been dealing drugs, including crack cocaine, and had "ripped off" his suppliers. Post's sister also gave Duval the license plate number of the pickup truck the three men were using, and Duval put out an alert for the truck. Shortly thereafter, Officer Gould of the Dover, New Hampshire, Police Department located the truck, still warm, at a Dover motel just over the line from Somersworth. Duval and another Somersworth officer joined Gould and another Dover officer at the motel.

The night clerk told the officers that three men matching Davis' description had entered the motel shortly before and had gone to Room 419, rented for cash by Kimberly Holland. The clerk also said that Holland had previously rented rooms at the motel and that

the clerk suspected the group members of drug dealing. Arriving on the fourth floor, the officers smelled marijuana coming from the room. Their knock produced the sound of movement and whispering inside the room, but no answer.

Gould then left to consult with a supervisor and Duval knocked again; a black male, Anthony Burnett, opened the door. The other men in the room were later identified as Quenta Parker, a black male, and Juan Feliciano, a light-skinned Hispanic. Duval questioned the men while waiting for Gould to return; this questioning lasted approximately ten to fifteen minutes. Asked by Duval about the incident at Davis' home, Burnett said that they had been visiting a friend; the address he gave was quite near Davis' house. In response to questions about the smell of marijuana, Feliciano admitted that he had "smoked a joint, but it's all gone." All refused the police request for consent to search the room.

Duval returned and one of the officers asked all four occupants (the men and Holland) for identification and to step outside the room. Duval then spoke privately to Holland, viewing her as having authority to consent to a search. This discussion lasted approximately ten minutes, during which Holland admitted to smoking marijuana but asked to consult with her boyfriend, "Q" (Parker). Parker then allegedly admitted that they had smoked marijuana and that there was still some inside the room. But he

-3-

told Holland not to consent to a search, and she then denied consent.

The occupants were held at the motel until around midnight when a search warrant was finally secured; this was roughly three to three and a half hours after the decision was made to seek the warrant. A search of the room turned up a small safe--later found marked with Parker's fingerprints--containing a black .32 caliber handgun, two loaded magazines, a holster and ammunition pouch, two knives, several pills, $3000 cash, and approximately 550 grams of crack cocaine. More cash ($2750) was found in a leather jacket in the room. Parker and the two other men were then formally arrested.

A federal grand jury indicted Parker for conspiring with Burnett and others to distribute and to possess with intent to distribute crack cocaine, 21 U.S.C. § 846 (2006), for possession with intent to distribute crack cocaine, id. § 841(a)(1), and for possession of a firearm in furtherance of a crime of drug trafficking, 18 U.S.C. § 924(c)(1)(A) (2006). After an evidentiary hearing, Parker's request to suppress the physical evidence was denied. Parker then pled guilty on all counts, reserving his right to appeal from the denial of his suppression motion, and was sentenced to 195 months in prison.[1]

---

[1]Parker was sentenced to 135 months for each of the two drug counts (each carried a mandatory minimum term of ten years, see 21 U.S.C. §§ 841(a)(1), 846), to be served concurrently, and to sixty months on the gun count to be served consecutively (the mandatory minimum, see 18 U.S.C. § 924(c)(1)(A)).

Parker's first claim on appeal is that requiring him to leave the hotel room was a seizure in violation of the Fourth Amendment, "the 'fruits' of which must be suppressed." The district court's findings on the denial of a suppression motion are reviewed for clear error, but its legal determinations are reviewed de novo. United States v. Smith, 423 F.3d 25, 31 n.4 (1st Cir. 2005), cert. denied, 126 S. Ct. 2287 (2006). Here, asking Parker to step outside the room was not unlawful; nor, had it been unlawful, would the items seized in the room be suppressed as forbidden fruit.

The complication in this case is not the initial knock nor the preliminary inquiries, see United States v. Cephas, 254 F.3d 488, 493-94 (4th Cir. 2001), but rather the request to step outside the room. Such a situation is at the crossroads of two different Fourth Amendment doctrines--one governing ordinary arrests and brief investigative stops; the other, entry into the home. There is some tension between the approaches taken by the Supreme Court in these situations.

Outside the home, the police can arrest without a warrant anyone who they have probable cause to believe committed a felony, see, e.g., Carroll v. United States, 267 U.S. 132, 156 (1925); see also United States v. Watson, 423 U.S. 411 (1976); and, merely on "reasonable suspicion," the police can temporarily detain an individual for an investigative inquiry called a Terry stop, Terry v. Ohio, 392 U.S. 1 (1968), whether the suspect is in a car or on

-5-

foot.  United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975).

By contrast, the strong presumption is that a warrant based on probable cause is required to justify police entrance into the home or other private quarters, whether to seize property or person.  Payton v. New York, 445 U.S. 573, 588-90 (1980); Stoner v. California, 376 U.S. 483, 490 (1964).  The discrepancy in doctrine as between street and home the is narrowed but not eliminated by certain exceptions licensing entry without a warrant, e.g., United States v. Samboy, 433 F.3d 154, 158 (1st Cir. 2005), cert. denied, 126 S. Ct. 1926 (2006) (exigent circumstances);  United States v. Luciano, 329 F.3d 1, 7 (1st Cir. 2003) (consent).

The closest precedent in our circuit is  United States v. Beaudoin, 362 F.3d 60, 69-70 (1st Cir.), cert. denied, 543 U.S. 979 (2004), vacated on other grounds sub. nom. Champagne v. United States, 543 U.S. 1102 (2005).  In Beaudoin, we held (albeit by a divided vote) that no warrant was required for a reasonable police request that the suspect step out of his hotel room.  We deemed the intrusion on privacy of such a direction to be real but modest, especially when weighed against the risk to police officers, and stressed the analogy to the Terry stop cases allowing investigative stops on the street.

Here, as in Beaudoin, the men inside the room were reasonably suspected of involvement in a felony (the threatening of Davis) and of possessing a gun.  Indeed, although the crime at issue

-6-

was less serious than in Beaudoin, the evidence pointing to Parker's involvement in it and the likelihood of his having a weapon were much stronger, as in Beaudoin police were acting merely on an anonymous tip. Id. at 62. Summoning Parker and the other men to step outside the hotel room was thus justified as a means of protecting the police while they pursued the investigation and of securing the weapon and other possible evidence when they decided to seek a warrant.

Having the men outside the room, the police could perhaps have arrested them on the spot. Davis' statement provided probable cause, not mere suspicion, to arrest the men who had threatened her; and the tracing of the truck to the motel and the desk clerk's identification point to the men in Room 419 as the culprits. But absent exigent circumstances, Samboy, 433 F.3d at 158, or consent, Luciano, 329 F.3d at 7, the police still needed a warrant to search the room for physical evidence. So, reasonably enough they awaited the warrant and the confirmation provided by the gun, drugs and money before making formal arrests.

Finally, even if Parker had been unlawfully seized, the later seizure of the safe would still not have been suppressible "fruits" of Parker's seizure. The warrant already in contemplation would inevitably have led to the safe being seized and searched, Nix v. Williams, 467 U.S. 431, 444, 446 (1984), there being probable cause for the warrant without regard to anything said by Parker.

-7-

United States v. Ford, 22 F.3d 374, 379-80 (1st Cir.), cert. denied, 513 U.S. 900 (1994). While awaiting the warrant the police were entitled to prevent the safe's removal. Illinois v. MacArthur, 531 U.S. 326, 331-33 (2001).

Parker next argues that, quite apart from the seizure, "[t]he failure to give [him and Holland] the warnings set forth in Miranda v. Arizona[, 384 U.S. 436 (1966)], prior to interrogating them was unlawful, and thus requires that the information they provided . . . as well as the 'fruits' thereof, be suppressed." He then contests the scope and duration of the initial encounter and the voluntariness of anything he said.

The questioning of Parker was not unlawful. Parker's admission to smoking a joint of marijuana occurred early in the period of detention and, under the Terry line of cases, it was not the result of a custodial "interrogation" of the kind requiring Miranda protection. United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001). Trueber holds that Miranda warnings are not required for "a brief period of detention" during which the police seek "by means of a moderate number of questions to determine [a suspect's] identity and to obtain information confirming or dispelling their suspicions." Id.

In this case, the motel was a neutral environment, there was no testimony that Parker was physically restrained, and the questioning was limited, being prompted in part by Parker's

-8-

girlfriend, who insisted that Parker be consulted before consent to search could be given.  See generally United States v. Nishnianidze, 342 F.3d 6, 13 (1st Cir. 2003), cert. denied, 540 U.S. 1132 (2004) (listing relevant factors in inquiry).  Whether at some point the stop matured into a de facto arrest could perhaps be debated, but no further admission was secured from Parker.

As it happens, neither Parker's admission nor the smell of marijuana was necessary to the warrant, which was amply supported by probable cause based on the threatening of Davis and the tracing of the truck to the motel.  And, under governing Supreme Court precedent, the physical fruits of an otherwise voluntary statement are admissible against a defendant even if a Miranda warning was wrongly omitted.  United States v. Patane, 542 U.S. 630, 641-42 (2004).  Miranda aside, Parker's statement was not "involuntary" under conventional standards.

Parker also argues that the search warrant was impermissibly broad because it allowed police to search for "weapon[s]" and "illicit drugs," but that there was only probable cause to support a search for marijuana and a single gun.  In fact, Davis had said that two different potential weapons were displayed; the third man could have had another weapon.  In addition to the marijuana smoke, there was reason to suspect that the male occupants might be connected with unspecified illegal drugs.  So there was

-9-

reason here to suppose that other weapons and drugs might well be found.

The warrant was particularized--guns and drugs are certainly a defined class--and far broader classes have been allowed.[2] Further, specifying weapons and drugs rather than a gun and marijuana can hardly have enlarged the intrusiveness of the search. Indeed, had the warrant referred only to a gun and marijuana, the officers would have been entitled to seize other guns and illegal drugs as suspected contraband if found in plain view in the course of the narrower search. See Horton v. California, 496 U.S. 128, 135 (1990).

Attacking his sentence, Parker says that he should not have received a consecutive five year mandatory minimum for carrying or using the gun because the statute so providing, 18 U.S.C. § 924(c)(1)(A), contains a qualifier that he says applies to him. Although he did not preserve the argument in the district court or present it to us in his briefs, it is useful (and does not prejudice the government) for us to address the claim on the merits.

The relevant part of section 924(c) states:

---

[2]See, e.g., United States v. Upham, 168 F.3d 532, 535-36 (1st Cir.), cert. denied, 527 U.S. 1011 (1999) (warrant allowing search of all computer software, hardware, computer disks, or disk drives upheld); United States v. Morris, 977 F.2d 677, 680-81 (1st Cir. 1992), cert. denied, 507 U.S. 988 (1993) (upholding part of warrant authorizing search for "all that is relating [sic] to drugs and narcotics").

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--
>
> > (i) be sentenced to a term of imprisonment of not less than 5 years . . . .

Subsections (ii) et seq. provide longer consecutive sentences for brandishing or discharge of the gun or the use of certain especially dangerous weapons like automatic weapons.

Parker's argument, in expanded form, goes as follows. The "except clause" makes the five year consecutive sentence inapplicable where "a greater minimum sentence is otherwise provided by this subsection or by any other provision of law"; Parker, by virtue of the amount of drugs recovered, was already subject to a mandatory minimum ten year sentence based on the drug convictions (actually, two mandatory minimums, served concurrently, see note 1, above); and therefore, the consecutive five year sentence is not applicable to him.

Parker's reading is suspect on its face because section 924(c)(1)(A)'s supplementary provision (quoted above)--by providing a five year sentence "in addition to the punishment" for the predicate crime--self-evidently intends that one who carries a firearm in connection with a serious drug offense should serve a

-11-

further consecutive sentence of five years.  Further, his reading would create very odd outcomes.[3]  A more careful reading defeats Parker's suggestion that the statutory language compels such results.

The except clause in this case ("Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law") does not say "a greater minimum sentence" for what; yet it has to have some understood referent to be intelligible.  Here, the referent could be "any other crime related to this case" or "the underlying drug crime or crime of violence."  Either of those readings would help Parker; but they, like any other reading of the phrase, require reading into the clause a referent not literally expressed.  Compare United States v. Rodriguez, 128 S. Ct. 1783 (2008).

An alternative (and more sensible) referent is obvious. Section 924(c) dictates an additional minimum sentence for an underlying offense because of the presence of the firearm; thus, if "a greater minimum sentence is otherwise provided" on account of the firearm, then under the "except clause" that greater minimum might supercede the otherwise applicable section 924(c) adjustment.

---

[3]For example, Parker would avoid the extra five years here because the ten year drug sentence stemmed from a mandatory provision; but he would serve the five years if given a ten year sentence--or even a higher one--for a drug offense or violent crime based not on a mandatory minimum provision but merely on the guidelines and trial judge's exercise of judgment.

Conceivably, Congress wished to avoid a double increment for the same firearm, so this is at least a plausible reading, while Parker's suggested readings are implausible based on the statutory purpose. See generally Caron v. United States, 524 U.S. 308, 315-16 (1998).

That very double-counting danger was arguably present in United States v. Whitley, 529 F.3d 150 (2d Cir. 2008), on which Parker principally relies. There the defendant was convicted and sentenced for Hobbs Act robbery, 18 U.S.C. § 1951, and also subject to a fifteen year mandatory minimum sentence because he possessed a firearm in the course of the robbery and had three prior convictions for violent felonies or serious drug offenses. 18 U.S.C. §§ 922(g)(1), 924(e)(1). Application of section 924(c), which the Whitley court disallowed, would have imposed a further ten year consecutive sentence for discharge of the same gun in the same robbery. 529 F.3d at 151-53, 158.

Because double counting was threatened, Whitley is easily distinguishable from our own case, and the remaining circuit precedents are adverse to Parker: other circuits have rejected any reading of the "except" clause that would reach our case and, indeed, some of the circuits would squarely reject Whitley.[4] We

---

[4]United States v. Jolivette, 257 F.3d 581, 586-87 (6th Cir. 2001); United States v. Studifin, 240 F.3d 415, 423-24 (4th Cir. 2001); United States v. Alaniz, 235 F.3d 386, 386 (8th Cir. 2000), cert. denied, 533 U.S. 911 (2001); see also United States v. Collins, 205 F. App'x 196 (5th Cir. 2006) (unpublished) (per curiam), cert.

-13-

need not decide how the _Whitley_ problem would be resolved in this circuit: it is enough that no double counting of the gun is presented here.  _Cessante ratione legis, cessat ipsa lex_.

_Affirmed_.

---

_denied_, 127 S. Ct. 3063 (2007); _United States_ v. _Baldwin_, 41 F. App'x 713, 715 (6th Cir. 2002) (unpublished).